## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT THAMES, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | No. 12-cv-09170 |
| COOK COUNTY, ILLINOIS | ) | |
| KENNETH BOUDREAU, | ) | |
| JAMES CASSIDY, | ) | Hon. James B. Zagel |
| THOMAS COUGHLIN, | ) | Magistrate Maria Valdez |
| WILLIAM FOLEY, | ) | |
| PAT McCAFFERTY, | ) | |
| RICHARD PALADINO, | ) | |
| FRANK. VALADEZ, | ) | |
| Chicago Police Detectives, | ) | |
| L. TULDIER (Star No. 1638), | ) | |
| Chicago Police Sergeant, | ) | |
| TERRENCE JOHNSON, | ) | |
| Cook County Assistant | ) | |
| State's Attorney, and | ) | |
| As-yet Unknown City of Chicago Employees, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Vincent Thames alleges as follows:

## Introduction

1.      Vincent Thames (hereafter, "Thames" or "Mr. Thames") spent sixteen years, four months, and fourteen days in State custody for crimes he did not commit.  Defendants knew that Thames did not commit these crimes at the time they coerced false confessions from Thames and his co-defendants and at the time they caused Thames to be improperly arrested and charged with the rape and murder of Nina Glover.

2.      The sum total of the evidence against Thames, who was seventeen-years-old at the time, was his and his co-defendants' false confessions.  These false confessions were coerced

by several Chicago police detectives who have a long and notorious history of engaging in improperly coercive interrogations. No physical evidence connected Mr. Thames or any of his co-defendants to the crime.

3.    Recent DNA testing revealed that Ms. Glover's rape and murder was committed by Johnny Douglas, who at the time of Ms. Glover's murder was a convicted felon with a lengthy history of violent crimes.   Neither Mr. Thames nor any of his co-defendants knew Douglas.

4.    Defendant Officers, however, chose to focus their attention instead on framing Thames and his co-defendants, even though the police knew about Douglas's history of violence and even though the police interviewed Douglas when he was inexplicably present at the location where Ms. Glover's body was found, precisely when it was found at approximately 7:00 a.m. on November 7, 1994.   Tragically, Douglas was allowed to remain free as a result of the Defendants' improper conduct.   Over the next few years, Douglas was convicted of one strangulation-murder and charged with another.   In total, Douglas was implicated in at least seven violent physical and sexual assaults of women between 1993 and 1997, several involving strangulation, the same method in which Ms. Glover had been killed.

5.    On July 23, 2011, Mr. Thames completed his sentence, which included a period of mandatory supervised release in which Thames remained incarcerated.   As noted above, he spent sixteen years, four months, and fourteen days in custody for crimes he did not commit. These included the most formative years of his life, which he spent separated from his family and friends and robbed of his most basic of freedoms and opportunities.

**Jurisdiction and Venue**

6.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Thames' rights as secured by the United States Constitution and also pursuant to Illinois common law.

7.      This Court has jurisdiction over Thames' federal claims pursuant to 28 U.S.C. §§ 1331 and 1332.  This Court has jurisdiction over Thames' state law claims pursuant to 28 U.S.C. §§ 1332 and 1367.   Thames' damages are in excess of $75,000.

8.      Venue is proper under 28 U.S.C. § 1391(b).  Defendant City of Chicago is a municipal corporation located here.  The events giving rise to Thames' claims occurred within this judicial district.

**The Parties**

9.      Vincent Thames is 35 years old and resides in Paducah, Kentucky.  At the time of Ms. Glover's murder, Thames was seventeen years old and lived with his family at 5356 S. Bishop Avenue, Chicago, IL.

10.      At all relevant times, Defendants Kenneth Boudreau, Richard Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Pat McCafferty were detectives with the Chicago Police Department employed by Defendant City of Chicago and acting within the scope of their employment.  None of these defendants are citizens of Kentucky.

11.      At all relevant times, Defendant L. Tuldier was a sergeant with the Chicago Police Department employed by Defendant City of Chicago and acting within the scope of his employment.  Defendant Tuldier is not a citizen of Kentucky.

12.      Defendants Boudreau, Paladino, Cassidy, Coughlin, Foley, Valadez, McCafferty, Tuldier, and as-yet Unknown Current or Former City of Chicago Employees are referred to collectively as the "Defendant Officers."

3

13.     Defendant Terrence Johnson was an Assistant State's Attorney employed by the Cook County State's Attorney's Office at all relevant times.  Defendant Johnson is not a citizen of Kentucky.

14.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

15.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of the Cook County State's Attorney's Office, and was at all relevant time Defendant Johnson's employer.

**The Glover Murder**

16.     On November 7, 1994 at approximately 7 a.m., the driver of a City of Chicago garbage truck discovered Nina Glover's dead and nude body in a dumpster behind the Family Super Mart Liquor Store at 1400 W. Garfield, Chicago, IL.  Ms. Glover's body was wrapped in a blood-stained bed sheet, along with her clothing and shoes.  According to an autopsy, Ms. Glover had been killed by strangulation.

17.     Defendant Cassidy and other Chicago Police Department personnel were assigned to investigate the crime. When Defendant Cassidy arrived at the crime scene, four individuals identified themselves: the garbage truck driver who had discovered the body; an assistant manager for the liquor store; a neighborhood resident who lived around the corner; and Johnny Douglas.  Douglas was at that time a convicted felon with a lengthy criminal history, and he had no logical explanation for why he was at the crime scene, many miles from his home, at 7:00 that morning.  The Defendants Officers, however, never investigated Douglas for Ms. Glover's murder.

4

18.     Within four months of Ms. Glover's death, the Defendant Officers' investigation of her murder had come to a complete standstill.

**The False Case Against Thames**

19.     On the night of March 7, 1995, one or more of the Defendant Officers approached 18-year-old Jerry Fincher and a friend of Fincher's on the street outside Fincher's home, a few blocks from the alley where Ms. Glover's body had been found.  One of the Defendant Officers frisked both Fincher and his friend and asked them about Ms. Glover's murder.

20.     Fincher told these Defendant Officers that he remembered a woman's body having been found in a nearby dumpster a few months back, and he told them that he and a friend had seen the police take the body away.  Even though Fincher did not implicate himself, Thames, or any of Thames' co-defendants, these Defendant Officers arrested Fincher and took him to the Area One police station at 51st and Wentworth ("Area One").

21.     Fincher was detained at the police station for nearly two days.  Despite telling the Defendant Officers that he knew nothing about the crime and was not in any way involved in it, he was kept in handcuffs, forced to spend two sleepless nights in interrogation rooms, and threatened with physical violence.  Defendant Valadez and other Defendant Officers fed Fincher details about Ms. Glover's rape and murder.  Defendant Valadez and other Defendant Officers also told Fincher that he would go to prison for the murder unless he cooperated.  At one point, one of the Defendant Officers placed a phone book against his chest and pounded the phone book with a flashlight, hurting Fincher.  Defendant Valadez and the other Defendant Officers present directed Fincher to cooperate and told him that if he did cooperate, he could go home.

22.     Due solely to the unlawful coercion of Fincher, Fincher finally acquiesced and made the statements that these Defendant Officers demanded.  These statements, which were

5

simply regurgitation of false facts that certain of the Defendant Officers had fed to him, falsely implicated Thames, Thames' co-defendants, and himself in Ms. Glover's rape and murder. Fincher also gave a recorded statement to Defendant Johnson on March 9, 1995.

23.     The Defendant Officers knew that Fincher's statement to Defendant Johnson was false, and that it was simply a recitation of Defendant Valadez's and certain other Defendant Officers' fabrications. Nevertheless, Defendant Officers rounded up the rest of the teens, whose names they had provided to Fincher, in order to continue building their false case.

24.     On March 9, 1995, sometime between midnight and 1 a.m., certain of the Defendant Officers took Thames from his home and transported him to Area One, where they handcuffed Thames to the wall of an interrogation room. Thames was seventeen at that time.

25.     At the beginning of Thames' interrogation, Defendants Paladino and Coughlin asked Thames what he knew about Ms. Glover's murder and about his role in it. Thames repeatedly told Defendants Paladino and Coughlin that he did not know anything about the rape or murder, and that he had nothing to do with the rape or murder.

26.     After Thames stated truthfully that he was innocent and that he knew nothing about of Ms. Glover's rape and murder, Defendants Paladino and Coughlin threatened him by telling him that he would get "natural life" in prison unless he confessed to his involvement. Thames was extremely frightened by Defendants' threat that he would serve natural life in prison for crimes that he did not commit. Thames' fear, and his inexperience with police interrogation, made Thames an easy target for Defendants Paladino's and Coughlin's unlawful coercion. When Defendants Paladino and Coughlin took a break from interrogating Thames, Defendants Cassidy and McCafferty interrogated Thames. All of these interrogations took place without a

6

parent, guardian, or youth officer to view the officers' conduct. All of these interrogations took place without a videotape, audiotape, or court reporter to record the officers' conduct.

27.     Before and during Thames' interrogation, Defendant Johnson provided Defendants Paladino, Coughlin, Cassidy, and McCafferty with details from the interrogation of Fincher.  In addition, sometime during Thames' interrogation, Richardson was arrested and interrogated in a separate room at Area One. Defendant Johnson also provided Defendants Paladino, Coughlin, Cassidy, and McCafferty with details from the interrogation of Richardson.

28.     After Defendants Paladino, Coughlin, Cassidy, and McCafferty had pressured and coerced Thames for seventeen hours, Thames finally succumbed and began to go along with Defendant Officers' fabrications.  At approximately 7:30 p.m. on March 9, 1995, Defendant Johnson entered Thames' interrogation room. Defendant Johnson, with Defendants Cassidy and McCafferty in the room, drafted a handwritten statement that Thames ultimately signed.

29.     Defendant Officers, however, were unsatisfied with certain details in Thames' initial statement because, upon information and belief, these statements did not comport with Defendant Officers' theory of the false case, their interrogations of Fincher and Richardson, and/or the physical evidence that the police purportedly uncovered at the time that the Chicago Police Department found Ms. Glover's body.  Therefore, Defendants Paladino, Cassidy and McCafferty fed Thames new details.  Defendants Paladino, Coughlin, Cassidy, and McCafferty unlawfully coerced Thames into going along with these new details.

30.     At approximately 10:30 p.m. on March 9, 1995, Defendant Johnson came back into Thames' interrogation room.  Defendant Johnson, with Defendants Cassidy and McCafferty in the room, drafted another handwritten statement that included the additional statements that Defendants Paladino, Coughlin, Cassidy, and McCafferty coerced Thames to insert into a new

7

statement.  Defendant Johnson drafted this statement despite being aware of the inconsistencies between Thames' statements, the inconsistencies between Thames' statements and those of his co-defendants', and, upon, information and belief, being aware of Thames' and his co-defendants' exculpatory statements.  Thames ultimately signed this new statement as well.

31.     Thames thought that by signing the two statements that he would be permitted to go home and that his ordeal would be over.  Instead these Defendant Officers and Defendant Johnson caused Thames to be held and charged with Ms. Glover's rape and murder.

32.     As noted above, Defendants Paladino, Cassidy and Coughlin also interrogated Richardson on March 9, 19995.  This interrogation also took place without the presence of a parent, guardian, or a youth officer.  Defendants Paladino, Cassidy, and Coughlin handcuffed Richardson to the wall of an interrogation room, fed him details of Ms. Glover's murder, and pressured Richardson to implicate himself in the crime. Richardson repeatedly told Defendants Paladino, Cassidy, and Coughlin that he did not know anything about Ms. Glover's murder.

33.     Defendants Paladino, Cassidy, and Coughlin (and perhaps others) told Richardson that they had evidence that Richardson was guilty.  The Defendant Officers interrogating Richardson also told him that three other teenagers had given confessions that squarely implicated Richardson in the murder.  Richardson again told the officers that he did not know anything about the crime or why those teenagers had named him as a participant.

34.     At some point during Richardson's interrogation, certain Defendant Officers took Richardson to a room with a two-way mirror, where he could see Thames.  Defendant Officers left Richardson in the room briefly so that he could watch but not hear Thames giving what appeared to be a statement. These Defendant Officers then took Richardson back to the

interrogation room, where Defendants Paladino and Cassidy, and perhaps others, made false promises of leniency to Richardson and pressured Richardson to confess.

35.     After hours of improper coercion by these Defendant Officers, Richardson falsely implicated himself, as well as Thames, Fincher, Swift, and Saunders.  Richardson was innocent and had nothing to do with Ms. Glover's rape and murder, and Richardson would not have falsely implicated himself and his co-defendants, including Mr. Thames, but for Defendant Officers' misconduct.

36.     Richardson ultimately refused to sign a written statement documenting his confession, knowing that it was false.  Nevertheless, Richardson was charged with first degree murder and aggravated sexual assault and taken to jail.

37.     During a pre-trial suppression hearing, Defendants Coughlin, Cassidy, Paladino, and Boudreau falsely testified about the circumstances surrounding Richardson's purported oral confession, and concealed their misconduct, coercion, and fabrications.  On the basis of their perjured testimony, Richardson's false confession was admitted as evidence against him at trial. It was the only evidence tying him to the murder.

38.     On March 9, 1995, also during Thames' interrogation, one or more of the Defendant Officers arrested Terrill Swift and brought him to Area One.  There, Defendants Paladino and Boudreau interrogated Swift for hours outside the presence of a parent, guardian, or attorney.  Defendants Paladino and Boudreau ignored Swift's multiple requests that he be allowed to call his mother.  Swift repeatedly told these and other Defendant Officers that he did not know anything about the murder and that he had nothing to do with the murder.

39.     During Swift's interrogation, certain Defendant Officers, including Defendants Paladino and Boudreau, fed Swift details of the Glover murder and instructed him to implicate

himself and the other teenagers in the crime. These Defendant Officers also made false promises of leniency to Swift. After hours of improper coercion from Defendant Officers Paladino, Boudreau, and perhaps others, Swift falsely implicated himself and his co-defendants in an oral statement transcribed by a court reporter.

40. On March 10, 1995, certain Defendant Officers arrested Saunders. Several Defendant Officers interrogated Saunders for hours, ignoring Saunders' requests for his mother and for an attorney. The Defendant Officers who interrogated Saunders threatened him with physical harm. After hours of improper coercion by these officers, Saunders signed a statement falsely implicating himself, Thames, Swift, Richardson, and Fincher. Saunders signed the statement without reading it, believing that after doing so, he would be permitted to go home.

41. Saunders was innocent and had nothing to do with Ms. Glover's rape or murder. Saunders would not have falsely implicated himself, Thames, Swift, Richardson, and Fincher but for the misconduct of these Defendant Officers.

42. Due to Defendant Officers' misconduct, coercion, and manipulations, as set forth in detail above, Thames, Swift, Saunders, Richardson, and Fincher were charged with first degree murder and aggravated sexual assault.

43. Defendant Officers never disclosed their misconduct. Furthermore, Defendant Officers failed to document any of the teenagers' truthful exculpatory statements, and never revealed to anyone that any exculpatory statements had been made.

**Apparent Unreliability of the Coerced and False Confessions**

44. The Defendant Officers deliberately fed Thames and his co-defendants details of the Glover murder so that their false and coerced confessions would appear reliable.

45.     In particular, the Defendant Officers told Thames and his co-defendants that Ms. Glover was strangled to death; that she was a known drug user and prostitute; that when her body was found, she was naked and there was evidence suggesting she had been sexually assaulted; that she had lacerations and bruises on her face, suggesting that she had been hit with a sharp object and physically assaulted; and that she was found in a dumpster, wrapped in a white sheet with gold flowers. Each of the teenagers included those details in their false and coerced confessions.

46.     Thames' and his co-defendants' confessions, however, contained inaccuracies and inconsistencies that should have alerted the Defendant Officers and those Defendants in supervisory positions to the likelihood that the confessions were not credible.

47.     As an initial matter, Thames' and his co-defendants' false and coerced confessions all stated that they committed the murder at approximately 9 p.m. on November 6, 1994. However, other evidence, corroborated by two independent witnesses, established that Nina Glover was alive as late as 11:30 p.m., if not later.

48.     Thames' and his co-defendants' statements also include varying accounts of how the victim was sexually assaulted. One statement claims the victim performed oral sex on all of them, while none of the other statements make any mention of oral sex. Further, each of the teenagers' statements gave materially conflicting statements about the order that they allegedly raped Ms. Glover.

49.     Moreover, each of the teenagers identified a different person as having carried Ms. Glover's body to the dumpster. Only some of the teenagers described getting a mop to clean the blood off the floor where the assault allegedly took place, and their statements are inconsistent as to where they got the mop.

11

50.     Furthermore, Thames' handwritten statement drafted by Defendant Johnson at approximately 7:30 p.m. on March 9, 1995 is materially inconsistent with Thames' statement that Defendant Johnson drafted at 10:30 p.m. on the same date.  The notable differences include a change in the location where the crimes allegedly took place, the deletion of a shovel as the murder weapon, and a change in the person who got a sheet to wrap Ms. Glover's body.

### Thames' Wrongful Conviction

51.     On November 24, 1997, Richardson was convicted after a bench trial of the aggravated sexual assault and murder of Ms. Glover.  The Court sentenced Richardson to 36 years in prison.

52.     On January 27, 1998, Saunders was convicted after a bench trial of the aggravated sexual assault and murder of Ms. Glover.  The Court sentenced Saunders to 40 years imprisonment.

53.     The evidence at Saunders' and Richardson's trials consisted almost exclusively of their coerced and false confessions. As the trial judge, the Honorable Thomas Sumner, remarked during that trial: "the whole question comes down to the statement[s]."

54.     After having already seen two of his three co-defendants convicted based solely on their similarly coerced confessions, Thames, at the specific advice of his defense counsel, pled guilty to the first degree murder and aggravated sexual assault of Ms. Glover.  On February 10, 1998, the Court sentenced Thames to 30 years in prison.

55.     Subsequent to Thames' guilty plea, Swift was convicted and sentenced to 36 years in prison.  Reiterating that the case the police officers had built against these defendants came down to their confessions, Judge Sumner stated during Swift's trial that "[t]his case is

relatively simple. It's all confessions. The State's case is a confession. Without a confession, there is no case."

56. The coerced nature of Thames' and his co-defendants' confessions was corroborated when Fincher's confession was deemed unreliable and excluded following a suppression hearing. The prosecutors dropped all charges against Fincher after Fincher's confession was excluded.

57. But for Defendants' misconduct, Thames would have been neither prosecuted nor convicted for Ms. Glover's rape and murder.

### Defendants' Pattern and Practice of Coercing False Confessions

58. Defendant Officers' misconduct in this case was no aberration.

59. Defendant Boudreau, for example, is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of unlawfully coercing confessions from innocent people for violent crimes, including murder. Defendant Cassidy, as another example, has a similarly notorious history for unlawfully coercing or manufacturing confession from juveniles, including as young as seven years old.

60. As a matter of widespread custom and practice, Chicago Police Department detectives, including but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and clear and close cases. Members of the Chicago Police Department, including Defendant Officers, systematically used similar tactics to those that Defendant Officers employed against Thames and his co-defendants in this case. These tactics include:

        a. physical violence and threats of physical violence;
        b. mental intimidation and manipulation;
        c. use of clearly unreliable or coerced informants;
        d. fabrication of confessions;

     e.   misleading of parents and manipulation of rules permitting parents to be present;

     f.   improperly denying teenagers access to their parents during interrogations;

     g.   improperly denying access to counsel;

     h.   improperly denying access to youth officers;

     i.   concealing exculpatory information; and

     j.   false promises of leniency in exchange for confessions and implication of others.

61.    At the time of the events leading to Thames' coerced confession and wrongful conviction, members of the Chicago Police Department, including the Defendant Officers, systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit and to falsely implicate others about whom they had no truthful evidence.

62.    Members of the Chicago Police Department, including but not limited to Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced confessions, including Mr. Thames' false and coerced confession, consistent with municipal policies and practices.

## **Thames' Exoneration**

63.    Even after being sentenced, Thames continued to fight to prove his innocence. He wrote a letter to Judge Sumner in 1998 trying to withdraw his guilty plea. In a further effort to fight his conviction, Thames filed a *pro se* motion in August 2005 to seek further DNA testing, as well as the State's investigative reports to corroborate his innocence. That motion was denied. Moreover, Thames moved *pro se* on August 4, 2008 to withdraw his guilty plea, but his motion was denied as untimely. Thames fought to prove his innocence even though he faced the uncertainty of a trial and the potential for an increased sentence if the court granted his requests to withdraw his guilty plea.

64.    On February 24, 2011, Richardson, Swift, and Saunders jointly filed a motion for post-conviction DNA testing, which motion was granted on March 29, 2011. Cellmark

Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts collected from Ms. Glover post-mortem. On May 13, 2011, the Illinois State Police submitted the DNA profile to the Combined DNA Index System (CODIS) database, which matched the DNA profile to Douglas.

65. On May 23, 2011, Thames and his co-defendants filed in the Circuit Court of Cook County a joint petition to vacate their sentences based on the newly-discovered DNA evidence and the evidence showing that Thames' and his co-defendants' confessions, which were the sole basis for their convictions, were false and coerced.

66. On November 16, 2011, the Honorable Paul P. Biebel, Jr., Chief Criminal Judge of the Circuit Court of Cook County, granted the petition and entered Orders vacating Thames' and his co-defendants' convictions.

67. On January 17, 2012, the State dismissed all charges against Thames and his co-defendants.

68. On September 14, 2012, Chief Judge Biebel issued Thames and his co-defendants Certificates of Innocence pursuant to 735 ILCS 5/2-702 ("Section 702"). In order to obtain a Certificate of Innocence under Section 702, Mr. Thames and his co-defendants, among other things, were required to prove by clear and convincing evidence, and did prove by clear and convincing evidence, that they were innocent of all charges against them.

## Thames' Damages

69. Thames was taken from his family and placed in custody when he was just seventeen years old. He was incarcerated until he was 34. He spent just short of 16-1/2 years in prison for crimes he did not commit. He must now attempt to make a life for himself outside of

prison without the benefit of nearly two decades of life experiences – including all of his adolescence and young adulthood – which normally equip adults for adulthood.

70.     By causing Mr. Thames' unlawful incarceration, Defendants stripped  him of his fundamental and constitutionally-protected freedom; stripped him of time with his family and friends, to share holidays, births, and other life events; and stripped  him of any reasonable opportunity for education and employment opportunities. Mr. Thames lost several relatives while he was incarcerated, including his father; he was denied the opportunity to attend their funerals.

71.     As a direct and proximate result of Defendants' misconduct, Thames was incarcerated continuously for sixteen years, four months, and fourteen days and has suffered tremendous damage, including but not limited to personal physical injury and mental suffering.

### Count I – 42 U.S.C. § 1983
### Violation of the Fifth and Fourteenth Amendments

72.     Thames incorporates each preceding paragraph of this Complaint as if fully restate here.

73.     Defendant Officers and Defendant Johnson, individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Thames to incriminate himself falsely and against his will.  Therefore, Defendant Officers and Defendant Johnson violated Thames' constitutional rights under the Fifth and Fourteenth Amendments.

74.     Defendant Officers and Defendant Johnson unconstitutionally interrogated Thames causing Thames to make involuntary statements that implicated Thames in Ms. Glover's rape and murder.

75.     Defendant Officers and Defendant Johnson fabricated, unlawfully coerces, and wrote false statements that Defendant Officers and Defendant Johnson attributed to Thames.

These false statements were used against Thames to his detriment in Thames' underlying criminal case. Thames was prosecuted and convicted for Ms. Glover's rape and murder based solely on these false statements.

76.     Defendant Officers' and Defendant Johnson's misconduct was objectively unreasonable. Defendant Officers and Defendant Johnson acted intentionally and with willful indifference to Thames' constitutional rights.

77.     Defendant Officers and Defendant Johnson proximately caused Thames to suffer injuries, including but not limited to loss of liberty, personal physical injury, and emotional distress.

**Count II – 42 U.S.C. §1983**
**<u>Violation of Due Process</u>**

78.     Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

79.     Defendant Officers and Defendant Johnson, acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment deprived Thames of his constitutional right to due process.

80.     Defendant Officers and Defendant Johnson individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence which caused Thames' conviction.

81.     Defendant Officers and Defendant Johnson individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory and impeachment evidence. By failing to disclose this information, Defendant Officers and Defendant Johnson violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

82.     Absent Defendant Officers' and Defendant Johnson's misconduct, Thames would not have been convicted.

83.     Defendant Officers' and Defendant Johnson's misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Thames and his continuing wrongful imprisonment.  Defendant Officers and Defendant Johnson thus deprived Thames of his constitutional right to not have his liberty taken away without due process, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

84.     Defendant Officers and Defendant Johnson proximately caused Thames to suffer injuries, including but not limited to loss of liberty, personal physical injury, and emotional distress.

85.     Defendant Officers' and Defendant Johnson's conduct was objectively unreasonable.  Defendant Officers acted intentionally and with willful indifference to Thames' constitutional rights.

## Count III – 42 U.S.C. § 1983
### Failure to Intervene

86.     Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

87.     Defendant Officers and Defendant Johnson stood by without intervening to prevent the violation of Thames' constitutional rights, even though they had the opportunity to do so.

88.     Thames suffered injury, including but not limited to emotional distress, as a result of Defendant Officers' and Defendant Johnson's failure to intervene to prevent the violation of Thames' constitutional rights.  Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

89.     Defendant Officers' and Defendant Johnson's conduct was objectively unreasonable.  Defendant Officers and Defendant Johnson acted intentionally and with willful indifference to Thames' constitutional rights.

90.     Defendant Officers' and Defendant Johnson's failure to intervene proximately caused Thames to suffer injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

### Count IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

91.     Thames incorporates each preceding paragraph of this Complaint as if fully restated fully here.

92.     After the murder of Ms. Glover, Defendant Officers and Defendant Johnson, acting within the scope of their employment and under color of law, agreed among themselves and with other as-yet-unknown individuals to act in concert to frame Thames and deprive Thames of his constitutional rights.

93.     Defendant Officers and Defendant Johnson further conspired to deprive Thames of exculpatory information to which he was lawfully entitled and which would have led to Thames not being charged, Thames not pleading guilty, or Thames' more timely exoneration.

94.     Defendant Officers and Defendant Johnson, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

95.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts, and was an otherwise willful participant in joint activity.

96.     Defendant Officers and Defendant Johnson willfully conspired with malice and/or reckless indifference to Thames' rights.

97. Thames' rights were violated, and he suffered physical harm, financial damages, and severe emotional distress and anguish as a direct and proximate result of Defendant Officers' and Defendant Johnson's illicit prior agreement referenced above.

## Count V – 42 U.S.C. § 1983
### Supervisory Liability

98. Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

99. Supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, caused Thames's wrongful conviction and continued wrongful detention by their deliberate indifference and recklessness, including when they failed to adequately train and supervise the individual Defendant Officers.

100. Specifically, the supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, were either personally involved in the case against Thames or knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

101. Furthermore, these supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, failed to supervise the individual Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence. The supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, thereby encouraged and/or permitted the individual Defendants to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which deprived Thames of his constitutional rights.

102.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.   The supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, failed to train and supervise their subordinates to ensure that they employed proper investigation procedures.   The supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, thus demonstrated deliberate indifference and reckless disregard for Thames' constitutional rights.

103.    The supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, proximately and directly caused Thames' constitutional deprivations and grievous personal physical injuries, including the above-mentioned injuries and damages, by failing to train and supervise the individual Defendants as described above.

104.    The misconduct of the supervisory defendants, including but not limited to Defendants Tuldier and Cassidy, was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Thames' clearly established constitutional rights.

### Count VI – 42 U.S.C. § 1983
### *Monell* **Policy Claim**

105.    Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

106.    At all times relevant to this complaint, Defendant City of Chicago's municipal policy makers with final policy-making authority and Chicago Police Department supervisors ratified, condoned, and facilitated the following policies, practices, and customs within the Chicago Police Department:

  a.  Conducting unlawfully coercive interrogations of witnesses, suspects, and arrestees to obtain confessions and the false implication of others;

21

b.  Unlawfully manipulating juveniles and teenagers to falsely confess and falsely implicate others, including by using the unlawful tactics describes in paragraph 58 above;

c.  Filing false reports, and giving false statements and testimony about interrogations, confessions, and witness statements;

d.  Suppressing evidence concerning unlawful interrogations, coerced confessions, and the coerced false statements against others;

e.  Pursuing and obtaining prosecutions and imprisonments on the basis of confessions obtained during the unlawful interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements; and

f.  Failing to video and/or audio tape interrogations;

107.  As a result of the City of Chicago's and Chicago Police Department's policies and practices described above, members of the Chicago Police Department, including Defendant Officers, acted with impunity when they violated citizens' civil rights, including teenagers such as Thames.

108.  The City of Chicago's failure to train, supervise, and discipline Defendant Officers, Defendants Paladino, Coughlin, Cassidy, and McCafferty, effectively condoned, ratified, and sanctioned these Defendant Officers' violation of Thames' and his co-defendants' constitutional rights.

109.  The City of Chicago's policies and practices described above were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

110.  Defendant Officers acted pursuant to the Chicago Police Department's policies and practices described above.

111.     The City of Chicago maintained and implemented the Chicago Police Department's policies and practices described above with deliberate indifference to Thames' constitutional rights.

112.     Thames' rights were violated, and he suffered physical harm, financial damages, and severe emotional distress and anguish as a direct and proximate result of the City of Chicago's actions.

113.     The City of Chicago is therefore liable for the Defendant Officers' misconduct.

**Count VII– State Law Claim**
**Malicious Prosecution**

114.     Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

115.     Defendant Officers and Defendant Johnson accused Thames of criminal activity knowing those accusations to be false and without genuine probable cause.  Defendant Officers and Defendant Johnson made statements to prosecutors with the intent of exerting influence to cause prosecutors to institute and to continue judicial proceedings against Thames.

116.     Defendant Officers and Defendant Johnson caused Thames to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

117.     Defendant Officers and Defendant Johnson made false statements regarding Thames' alleged culpability with knowledge that their statements were false and perjured. Defendant Officers and Defendant Johnson also fabricated evidence by coercing false testimony from Thames' co-defendants.  Defendant Officers withheld the facts about their manipulation and the resulting fabrications from Thames.

118.     Defendant Officers and Defendant Johnson acted with malice, willfulness, and reckless indifference to Thames' rights.

119.     Thames sustained and continues to sustain injuries, including but not limited to pain and suffering as a direct and proximate result of Defendant Officers' and Defendant Johnson's misconduct.

**Count VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**

120.     Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

121.     Defendant Officers' and Defendant Johnson's conduct described above was extreme and outrageous.  Defendant Officers' and Defendant Johnson's actions were rooted in an abuse of power or authority.  Defendant Officers and Defendant Johnson intended to cause, or recklessly disregarded the probability that their conduct would cause, severe emotional distress to Thames.

122.     Thames suffered and continues to suffer emotional distress as a direct and proximate result of Defendant Officers' and Defendant Johnson's actions.

**Count IX – State Law Claim**
**Civil Conspiracy**

123.     Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

124.     As described more fully in the preceding paragraphs, Defendant Officers and Defendant Johnson, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

125.     In furtherance of the conspiracy, Defendant Officers and Defendant Johnson committed overt acts and were otherwise willful participants in joint activity, including but not

24

limited to the malicious prosecution of Thames and the intentional infliction of emotional distress upon Mr. Thames.

126.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

127.    Thames suffered and continues to suffer damages, including severe emotional distress and anguish as a direct and proximate result of Defendant Officers' and Defendant Johnson's conspiracy

**Count X – State Law Claim**
**<u>Respondeat Superior</u>**

128.    Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

129.    Defendant City of Chicago is liable as principal for all torts committed by Defendant Officers because the City of Chicago was Defendant Officers' employer; and Defendant Officers were members of, and agents of, the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law, when committing the acts alleged above.

130.    Defendant Cook County is liable as principal for all tort committed by Defendant Johnson because the Cook County State's Attorney's Office was Defendant Johnson's employer, and Defendant Johnson was a member and agent of the Cook County State's Attorney's Office, acting all relevant times within the scope of his employment and under color of law, when committing the acts alleged above.

**Count XI – State Law Claim**
**<u>Indemnification</u>**

131.    Thames incorporates each preceding paragraph of this Complaint as if fully restated here.

132.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

133.    The City of Chicago must indemnify Defendant Officers.

134.    Cook County must indemnify Defendant Johnson.

WHEREFORE, VINCENT THAMES, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, COOK COUNTY, ILLINOIS, Chicago Police Department Detectives KENNETH BOUDREAU, JAMES CASSIDY, THOMAS COUGHLIN, WILLIAM FOLEY, PAT MCCAFFERTY, RICHARD PALADINO, and FRANK VALADEZ, Chicago Police Sergeant L. TULDIER, Cook County Assistant State's Attorney TERRENCE JOHNSON, and as-yet unknown City of Chicago Employees, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff Vincent Thames hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues triable to a jury.

Respectfully submitted,

/s/ Stuart J. Chanen
One of Plaintiff Thames' Attorneys

Stuart Chanen
Henry Turner
Counsel for Vincent Thames
Valorem Law Group
35 East Wacker Drive, Suite 3000
Chicago, IL  60601
Phone: (312) 676-5480